UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| LISA ULREY, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Case No. 3:16-CV-257 JD |
| WILLIAM REICHART, et al., | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Lisa Ulrey was an assistant principal in the Manchester Community Schools. She resigned at the superintendent's suggestion after a discrepancy came to light as to the validity of her teaching license. After the school board accepted her resignation, she had second thoughts, but the school did not allow her to rescind her resignation. This suit followed. Ms. Ulrey claims that the superintendent encouraged her to resign not because of the discrepancy in her teaching license, but because of a complaint she had made some months earlier to the school board about the superintendent's decision to allow a student to bring cigarettes to school. Ms. Ulrey claims that she was retaliated against for exercising her First Amendment rights, and that she was denied due process.

The defendants—the school district and the superintendent—moved for summary judgment. The Court grants the motion. Ms. Ulrey cannot maintain a First Amendment retaliation claim since her speech came as part of her employment and thus was not protected by the First Amendment. Nor was she denied due process, as she resigned instead of invoking the process that was available to her.

# I. FACTUAL BACKGROUND

Before recounting the relevant facts, the Court notes that the defendants have filed two motions to strike. In the first motion, the defendants seek to strike certain evidence Ms. Ulrey submitted in response to the motion for summary judgment. They focus primarily on statements in an affidavit Ms. Ulrey submitted, and argue that the materials are inadmissible for various reasons. However, none of the evidence subject to the motion to strike would affect the outcome of the issues upon which the Court resolves the motion for summary judgment, so the Court need not reach the admissibility of those materials. Second, the defendants moved to strike a surreply that Ms. Ulrey filed without having sought or received leave to do so. Ms. Ulrey's failure to seek leave for that filing is unacceptable, and there are no grounds for a surreply in the first place. Again, however, that filing has no effect on the outcome of the motion for summary judgment, so the Court need not strike that filing either. With that understanding, the Court proceeds to the facts.

Ms. Ulrey began teaching in the Manchester Community Schools in 2011. In the fall of 2013, the assistant principal at Manchester Jr./Sr. High School resigned, and Ms. Ulrey was offered and accepted that position. She served in an interim capacity for the rest of that school year, and officially assumed the position at the beginning of the 2014–15 school year. The principal at that school—Ms. Ulrey's direct supervisor—was Nancy Alspaugh, and the school district's superintendent was William Reichhart. As assistant principal, Ms. Ulrey's responsibilities included student discipline, which entailed enforcing the rules in the student handbook. [DE 47-6 p. 30, 150–51, 167; DE 50-10].

In the 2014–15 school year, Manchester Community Schools began a new program referred to as Squire Academy, which was an alternative education program aimed at assisting at-risk students to receive their high school diplomas. The program was housed in a separate

space of a building that also housed the district's administrative offices and its seventh-grade classrooms, so it fell within Ms. Ulrey's area of responsibility. [DE 49 p. 8 n.1]. In August 2014, Squire Academy's director, Dorey Mobley, contacted Dr. Reichhart about a student who had brought cigarettes to school in violation of the district's policy against possessing tobacco on school grounds. She asked Dr. Reichhart if he would approve an exception for that student, such that if the student brought cigarettes to school, he could turn them over to Ms. Mobley upon arriving and retrieve them when he leaves. Dr. Reichhart later explained in a letter to the school board that because the student was an at-risk student who was already old enough to legally possess tobacco, he believed that allowing this limited exception would be preferable to enforcing a policy that might discourage the student from attending school at all. Accordingly, he approved of the arrangement under which the student would not be punished for bringing cigarettes to school as long as he turned them over to Ms. Mobley while he was there.

Shortly thereafter, that same student was arrested for unrelated reasons at Heartland Career Center, a vocational school he attended in the afternoons, and he was found in possession of cigarettes. When confronted about the cigarettes, the student said that his teacher had given him permission to possess them. Heartland's principal thus called Ms. Alspaugh, who in turn called Ms. Mobley. Ms. Mobley reported to Ms. Alspaugh that Dr. Reichhart had given permission for the student to bring tobacco products to school so long as he turned them in when he arrived, and that she could return the cigarettes when the student left. Ms. Alspaugh relayed that news to Ms. Ulrey because Ms. Ulrey was responsible for student discipline and enforcing the student handbook, which included a prohibition on tobacco. [DE 47-6 p. 150–51].

Ms. Ulrey and Ms. Alspaugh were each surprised at and disapproved of that decision by Dr. Reichhart. Ms. Alspaugh thus placed a call to Dr. Reichhart on speakerphone while Ms.

3

Ulrey was in her office. Ms. Alspaugh asked Dr. Reichhart if he had given this permission, and Dr. Reichhart confirmed that he had. Upon hearing that, Ms. Ulrey became angry, and without awaiting any explanation from Dr. Reichhart and without telling him about her disagreement, Ms. Ulrey took Ms. Alspaugh's phone off of her desk, left the room, looked up the number for the president of the school board, Sally Krouse, and called her.

Ms. Ulrey reported to Ms. Krouse the decision that Dr. Reichhart had made. She indicated that she thought the decision was wrong and that it was against the student handbook. Ms. Krouse agreed to follow up with Dr. Reichhart. She sent him an email the next day indicating that she had learned that a student had been caught with cigarettes and claimed that he had been given permission to have them. Ms. Krouse indicated that she would be very concerned if anyone in authority had given such permission. Dr. Reichhart responded to Ms. Krouse and the rest of the school board and explained the situation. By that time he had also learned that Ms. Ulrey was the one who reported the information to Ms. Krouse, and he expressed his displeasure that Ms. Ulrey had taken the matter straight to Ms. Krouse without first expressing her concerns to him and attempting to resolve them within the administration. Ms. Krouse and another board member each responded to Dr. Reichhart's email by indicating their own disapproval that Ms. Ulrey had come to Ms. Krouse without first working through the chain of command.

The next day, Dr. Reichhart called Ms. Ulrey into his office and chastised her for going to Ms. Krouse without notifying him of her concerns. Dr. Reichhart had drafted a letter of reprimand for Ms. Ulrey prior to the meeting, but he did not issue the reprimand. Instead, Ms. Ulrey apologized to him and agreed that she would not go to the board in the future without first discussing it with him. After that, the incident was not discussed again.

Some months later, in late October 2014, Ms. Ulrey learned that there was a problem with her administrator's license. She had renewed her license two years earlier with the help of a friend who was also the licensing advisor at Manchester University, where she had completed some coursework. While it would have been possible for Ms. Ulrey to properly renew her license at that time, the license that she actually applied for and received was one for which she was not eligible, meaning her license was invalid. Two other teachers who had been assisted by that licensing advisor (who was by then under suspicion for misconduct) discovered around the same time that their licenses were invalid, which prompted Ms. Ulrey to review her own license and discover the error. Ms. Ulrey promptly informed Dr. Reichhart of the problem, and began working with state officials to correct her license. Dr. Reichhart met with Ms. Ulrey on multiple occasions to discuss the problem and learn how it had occurred. As assistant principal, Ms. Ulrey's duties included evaluating other teachers and participating in disciplinary proceedings, both of which required a valid administrator's license. That prevented her from acting as assistant principal until her license was corrected, and Dr. Reichhart was also concerned that it could have called into question the validity of any matters she had worked on while her license was invalid. Dr. Reichhart also expressed disbelief at how Ms. Ulrey, an administrator whose responsibilities included evaluating other teachers, could have failed to ensure that her own license was valid.

On November 4, 2014, Dr. Reichhart met again with Ms. Ulrey to discuss her license. Dr. Reichhart indicated the he did not believe her explanation of how she came to get her license renewed and that he could not trust her. Sensing that Dr. Reichhart wanted to get rid of her, Ms. Ulrey asked if he was asking her to resign. Dr. Reichhart said yes. Ms. Ulrey said that she would type up a letter of resignation, at which point Dr. Reichhart produced a letter that he had drafted

for Ms. Ulrey in preparation for the meeting. Ms. Ulrey signed the letter and left. At the next school board meeting, the board accepted her resignation.

Ms. Ulrey later retained an attorney and asked to rescind her resignation, but the school did not agree to do so. Accordingly, she filed this suit against Dr. Reichhart and the School Board of Manchester Community Schools. Discovery has now closed, and the defendants moved for summary judgment, which is fully briefed.

## II.  STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

## III.  DISCUSSION

Ms. Ulrey asserts two claims. She first asserts that she was deprived of due process when she was asked to resign. Second, she asserts that she was retaliated against for speech protected

by the First Amendment, namely her report to Ms. Krouse that Dr. Reichhart had allowed a student to bring cigarettes to school. The Court address each claim in turn.

## A. Due Process

First, Ms. Ulrey asserts a procedural due process claim, arguing that she was deprived of her employment without due process when she was asked to resign. Procedural due process claims entail two inquiries: (1) whether the plaintiff was deprived of a protected interest; and (2) if so, what process was due. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 571 (7th Cir. 2017). The defendants acknowledge that Ms. Ulrey had a protected property interest in her continued employment. They argue, however, that she was not denied due process because she voluntarily resigned, thus forgoing the procedural protections that were available to her. The Court agrees.

Indiana law provides extensive procedural protections by which a teacher can seek review of a decision to terminate her contract. A principal or superintendent can only make a "preliminary decision" to cancel a contract. Ind. Code § 20-28-7.5-2(a).[1] If an employee wishes to oppose such a decision, she can first request a private conference with the superintendent. *Id.* § 20-28-7.5-2(b). After the conference, the superintendent may make a "recommendation" to the School Board. *Id.* § 20-28-7.5-2(d). The employee can then request a private conference with the School Board, which makes the final decision. *Id.* § 20-28-7.5-2(f). If the employee chooses not

---

[1] These provisions apply to terminating teachers' contracts, but they would have applied to Ms. Ulrey because she had a teacher's contract in addition to being an administrator. *Hewitt v. Westfield Wash. Sch. Corp.*, 46 N.E.3d 425, 432 (Ind. 2015); [DE 47-4; 50-2 ¶ 53]. In addition, Ms. Ulrey has waived any argument as to the applicability of these procedures by failing to respond to the defendants' arguments on that point. In fact, she does not contest the adequacy of any procedures that were available; her argument is only that the procedures were denied to her because she was asked to resign. And for that matter, Ms. Ulrey does not develop any argument that she was constructively discharged, but argues only that asking her to resign met the lower standard for actionable conduct that applies to First Amendment retaliation claims.

7

to seek review of the superintendent's recommendation, though, the decision becomes final. *Id.* § 20-28-7.5-2(e).

All that process was available to Ms. Ulrey. But instead of choosing to invoke it, she resigned. "A public employee who voluntarily resigns cannot complain about a lack of due process . . . ." *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010); *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982) ("[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."). Ms. Ulrey argues that her resignation was not truly voluntary, but she offers no evidence that she was coerced. Dr. Reichhart asked for her resignation, but she could have said "no." Ms. Ulrey asserts that Dr. Reichhart expressed distrust of her explanation about her teaching license and implied that she was being dishonest, but that does not make her employment so unbearable that she had to resign. *See Palka*, 623 F.3d at 453 ("Constructive discharge occurs when an employer makes employment so unbearable that an employee resigns[.]"); *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) ("[A] working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background." (internal quotation omitted)).

Even if Ms. Ulrey believed that Dr. Reichhart intended to recommend her firing—or even if Dr. Reichhart had told her so explicitly—that would not have deprived Ms. Ulrey of due process. The Board is the final decisionmaker, and the whole point of the review process is to allow the employee to be heard by the Board once the superintendent recommends a termination. A superintendent's intent to make such a recommendation thus does not excuse an employee from engaging in that process. *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004) (rejecting an argument that "notice of intent to commence a process leading to discharge

may be treated, at the employee's election, as a completed discharge"); *Levenstein v. Salafsky*, 414 F.3d 767, 774–75 (7th Cir. 2005) (holding that the initiation of a process to terminate an employee does not constitute a constructive discharge). "[T]he prospect of being fired at the conclusion of an extended process is not itself a constructive discharge." *Cigan*, 388 F.3d at 334.

In short, the defendants did not deny Ms. Ulrey due process; she chose to resign instead of invoking any process that was available to her. The Court therefore grants the motion for summary judgment as to Ms. Ulrey's due-process claim.

**B.     First Amendment Retaliation**

Ms. Ulrey next asserts a First Amendment retaliation claim, arguing that Dr. Reichhart retaliated against her for having reported to Ms. Krouse that he allowed a student to bring cigarettes to school. Ms. Ulrey bases this claim on two instances of alleged retaliation: that Dr. Reichhart scolded her and made her apologize once he learned that she had brought the issue to Ms. Krouse; and that some months later, after the issue with her teaching license came to light, Dr. Reichhart asked her to resign.[2]

The threshold question in a First Amendment retaliation claim is whether the speech was constitutionally protected. *Kubiak v. City of Chi.*, 810 F.3d 476, 481 (7th Cir. 2016); *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013). "The inquiry into the protected status of speech is one of law, not fact." *McArdle*, 705 F.3d at 754. For speech by public employees, determining whether speech is protected entails three steps. First, the speech must

---

[2] Neither of these instances would have constituted an adverse employment action in the context of Title VII, but the standard for actionable conduct under § 1983 for First Amendment retaliation is lower, and only requires conduct sufficiently adverse to deter the individual's speech. *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) ("A § 1983 retaliation claim does not require an adverse employment action with the same meaning as other anti-discrimination statutes."); *Power v. Summers*, 226 F.3d 815, 820–21 (7th Cir. 2000). The defendants also dispute that Ms. Ulrey's resignation had anything to do with her speech over two months prior. Since the speech was not protected, though, the Court need not further discuss those issues.

9

have been made in the plaintiff's "capacity as a private citizen and not as an employee." *Id.*; *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). Second, the speech must address "a matter of public concern." *Swetlik*, 738 F.3d at 825. Third, the employee's interest in expressing that speech must not be "outweighed by the [employer's] interests as an employer in 'promoting effective and efficient public service.'" *Id.* (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)).

Here, Ms. Ulrey's claim fails at the first step, as her speech was made in her capacity as an employee, not as a private citizen. As the Supreme Court held in *Garcetti*, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Kubiak*, 810 F.3d at 481. This inquiry is not limited to an employee's "core" job functions, but looks to "whether an 'employee's expressions were made pursuant to official responsibilities.'" *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 424 (internal alteration omitted)).

Here, Ms. Ulrey's job functions included student discipline and enforcement of the student handbook. Her responsibilities included "coordinat[ing] and administer[ing] student attendance and discipline policies." [DE 50-10]. Ms. Ulrey testified that the "enforcement of the entire student handbook was under [her] domain," that "[d]iscipline was [her] area," and that tobacco possession "was against school policy, [and the] student handbook." [DE 47-6 p. 80; *see also* DE 49 p. 12 (asserting that she "was in charge of student discipline.")]. Ms. Ulrey also

asserts in her brief that the Squire Academy student was within her administrative responsibility. [DE 49 p. 8 n.1]. Ms. Ulrey's speech at issue bore directly on those responsibilities. She reported to Ms. Krouse that Dr. Reichhart had allowed a student to bring cigarettes into school, which she believed was contrary to the school's disciplinary rules. That related to Ms. Ulrey's official responsibilities because Dr. Reichhart's decision affected her ability to enforce the school's policies and allowed a student to engage in conduct that would have otherwise subjected the student to discipline. In fact, Mr. Ulrey testified at her deposition that she was angry about Dr. Reichhart's decision "because of [her] role in enforcing the handbook." [DE 47-6 p. 103].

In arguing that her speech was not made as a public employee, Ms. Ulrey frames her speech as reporting misconduct by Dr. Reichhart—authorizing activity that violated the school's policies—and she argues that her job entailed student discipline, not "superintendent discipline." That focus is much too narrow, though. While it was not Ms. Ulrey's job to oversee the superintendent, it was her job to enforce the student handbook, and she was complaining about a decision by Dr. Reichhart that directly affected her ability to do so in the way she thought was required and appropriate. She also directed her speech to Dr. Reichhart's superior for the purpose of influencing that decision. Thus, she was speaking about matters that directly affected her area of responsibility as assistant principal.

The Seventh Circuit has repeatedly held in similar cases that an employee's speech was not protected because it was made as a public employee, even if it implicated misconduct by a superior. In *McArdle*, for example, a school principal discovered what she believed to be misconduct by her superior, including using school funds for personal purposes, giving directions that violated district policy, and circumventing rules regarding admission procedures for nonresident students. 705 F.3d at 753. She argued that oversight of her superior was not part

11

of her job, so her speech should be protected, but the court disagreed. It noted that the school's finances and its adherence to district policies "were all matters within [the plaintiff's] oversight as the school's principal, and were all allegedly impacted by [the superior's] misconduct." *Id.* at 754. The court concluded that in reporting the alleged misconduct, the plaintiff "spoke about matters that directly affected her area of responsibility," so her speech was as a public employee and was not protected by the First Amendment. *Id.*

Likewise, in *Spiegla*, the plaintiff had been a correctional officer who was responsible for conducting searches of both employees and visitors at the main gate of a prison, for the purpose of preventing contraband from entering the facility. 481 F.3d at 962–63. She observed activity by two of her superiors that suggested they may have been smuggling contraband into the facility, but she was directed not to search them because of a new exception to the vehicle-search policy. She reported her superiors' suspected misconduct, and later claimed that she was retaliated against for that speech. The court concluded, however, that her speech was not protected because she was speaking as a public employee, not as a private citizen. The court had emphasized in a previous opinion in the same case that the plaintiff's "job function was to implement prison security policies, not to question those policies or to report the suspicious activities of her colleagues." *Spiegla v. Hull*, 371 F.3d 928, 939 (7th Cir. 2004). The court held, however, that because "ensuring compliance with prison security policy was part of what she was employed to do," she was speaking as a public employee even though her speech "highlighted potential misconduct by prison officers." *Spiegla*, 481 F.3d at 966–67. Thus, her speech was not protected by the First Amendment.

Those cases are not exceptions, but are consistent with many other cases in which the Seventh Circuit has held that speech addressing misconduct bearing on an employee's duties was

12

not protected, even where the employee's job was not to investigate or report misconduct. *E.g.*, *Kubiak*, 810 F.3d at 482 (holding that a police officer's report of misconduct by another officer was not protected speech, despite her argument that her professional duties did not include reporting misconduct by her coworkers); *Trigillo v. Snyder*, 547 F.3d 826, 830 (7th Cir. 2008) (holding that the plaintiff's statement, in which she raised potential misconduct and criticized policies within her department, was made as a public employee); *Renken v. Gregory*, 541 F.3d 769, 773–74 (7th Cir. 2008) (holding that a professor's report of misuse of grant funds by the dean was not protected, as the professor's job included administering grant funds); *Vose v. Kliment*, 506 F.3d 565, 571 (7th Cir. 2007) (holding that a public employee's commentary about misconduct affecting an area within his responsibility is considered speech as an employee, even where investigating and reporting misconduct is not included in his job description or routine duties); *see also Smith v. Ill. Sch. Dist. U-46*, 120 F. Supp. 3d 757, 772–73 (N.D. Ill. 2015) (holding that a teacher's report about another teacher's criminal history was not protected speech, even though "no one contends that [the plaintiff's] routine job duties included monitoring his fellow teachers' criminal records").

Ms. Ulrey does not acknowledge any of those cases or attempt to distinguish them, nor is there any apparent basis for doing so. Accordingly, the Court finds that Ms. Ulrey's speech was made as a public employee, not as a private citizen, so it is not protected by the First Amendment. The Court thus grants the motion for summary judgment on the First Amendment retaliation claim.

## IV. CONCLUSION

For those reasons, the Court GRANTS the defendants' motion for summary judgment. [DE 45]. The defendants' motions to strike are DENIED as moot. [DE 54, 57]. The Clerk is DIRECTED to enter judgment in favor of the defendants.

13

SO ORDERED.

ENTERED: December 7, 2018

                                          /s/ JON E. DEGUILIO
                                      Judge
                                      United States District Court